## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

**CIVIL ACTION NO. 4:06CV-52-M**

**JAMES W. HANCOCK, JR.**                                                             **PLAINTIFF**

**V.**

**ISLAND CREEK COAL CO.**                                                       **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion in limine by Defendant, Island Creek Coal Co., to preclude Plaintiff from introducing, arguing, or otherwise referring to certain damages at trial [DN 38]. Plaintiff, James Hancock, has filed a response [DN 47]. Fully briefed, this matter is ripe for decision.

### BACKGROUND

Plaintiff, James Hancock (hereinafter "Hancock"), owns approximately 1,275 acres of land located in Union County, Kentucky. For decades, Hancock used his property primarily for the purpose of raising crops. In 1997, Hancock decided to lease his property to S & S Farms which has farmed the property since that time. Shortly after the lease arrangement began, Hancock began to notice changes in the terrain on his property. Hancock claims that the affected areas are above underground mines previously operated by Defendant, Island Creek Coal Company (hereinafter "Island Creek"). As a result of the alleged subsidence on the property, Hancock brought this suit in the Union Circuit Court. Island Creek removed the action to this Court.

Island Creek has filed a motion in limine to preclude Hancock from introducing certain evidence related to damage. Island Creek argues that Hancock's claims against it are severely flawed as a result of the reports of his experts. First, Island Creek argues that Hancock's claims of future subsidence damages are improper because they are speculative and unfounded. Second, Island Creek maintains that the testimony of Hancock's subsidence expert should be greatly limited because he admittedly failed to follow his own methodology for the vast majority of property he concluded was subsided. Third, Island Creek contends that the testimony of Hancock's real estate appraiser fails to past the Daubert standard as he uses a methodology that is specifically prohibited under Kentucky law. Finally, Island Creek argues that Hancock's claim for remediation damages should be excluded under Kentucky law because the remediation costs far exceed the alleged diminution in market value that could be available as damages. The Court shall address Island Creek's arguments in turn.

## DISCUSSION

### A. Claims for Future Subsidence Damage

Island Creek argues that Hancock should be precluded from introducing evidence of damages for future subsidence because such claims are speculative and unfounded. Island Creek contends that claims for damages due to possible future subsidence are not favored by the courts because they are speculative in nature. Nixon-Egli Equipment Co. v. John A. Alexander Co., 949 F. Supp. 1435, 1446 (C.D. Cal. 1996)("there must be evidence to support both the fact of future damages as well as the amount of such damages"). Island Creek argues that Hancock has failed to produce evidence supporting either that future subsidence

2

is reasonably certain to occur or a basis for establishing "the risk such that one could attempt to discount the property value by the risk of future subsidence." Id. According to Island Creek, Hancock's real estate appraiser, C.W. Wilson, has opined that Hancock's damages are not only limited to the 25 acres allegedly affected by the subsidence, but extend to every other acre under which mining has occurred. Island Creek maintains that there is no evidence to support that the other acreage will subside in the foreseeable future. Island Creek contends that Hancock's geologist, Ronald Yarbrough, testified that a maximum of 25 acres are presently affected and the other areas of the farm under which Island Creek mined may not collapse for "a thousand years." (Yarbrough Deposition at 93.)("Every void in the Earth's surface at one time is going to close. And I'm not going to tell you when, because I don't think anybody knows." Id. at 92.).

In response, Hancock argues that his claims for future subsidence damage are not speculative. At trial, Hancock intends to present evidence that Island Creek received a permit to remove coal from beneath the property in question in the Hamilton No. 2 Mine on the basis that it would extract no more than 50% of the coal. In violation of this permit, Hancock asserts that Island Creek extracted 20% more coal in the panels than it was legally allowed to extract. (See December 24, 2008, Letter Alexander Young at 2 ("the extraction rate of the calculated panels below the depressed surface area was at least 24% higher than specified by the permit"); Young Expert Report at 2.) Hancock argues that John Donan, Island Creek's expert witness on the issue of subsidence, even calculated the extraction rate for the mine panels below the property at "about 60% of the coal in place." (John Donan

Expert Report at 4.)  According to Hancock, Dr. Yarbrough indicated that "the subjacent mine will continue to decay and in those areas of high coal extraction and adverse rock conditions void closure will continue in the mine and more subsidence of the surface and interruption of drainage in the agricultural fields will occur in the future." (Yarbrough July 24, 2008 Letter.)  Additionally, Dr. Yarbrough also stated that "[i]n the opinion of this geologist and subsidence expert, Ronald Yarbrough, this amount of extraction, considering the geology (based on drill logs over the coal seam) is excessive and results in a high expectation and reasonable probability for subsidence of the surface, past, present and future." (March 21, 2009 Yarbrough Rebuttal Statement at 2.)  Further, Hancock argues that he and his tenants have identified several areas that have already subsided on the farm totaling 24.77 acres.  Finally, Hancock submits the expert report of C.W. Wilson who calculated the diminution of fair market value of the land considering the actual subsidence and threat of future subsidence based on his experience in the industry and his assessment of other comparable land sales.  Based on all this evidence, Hancock argues that he has produced evidence supporting that future subsidence is reasonably certain to occur and that the diminution in the value of his land due to that factor.

In order to determine whether Hancock has produced evidence supporting his claim that future subsidence is reasonably certain to occur, a review of the expert opinion of Dr. Ronald Yarbrough is necessary.  In investigating the mine subsidence on the property, Dr. Ronald Yarbrough, Plaintiff's subsidence expert, conducted a site visit, consulted with Mr. Hancock and Mr. David Shouse regarding ponding of water and reduction of crop yields on

the property, toured the farm, and conducted a level survey of two areas to "substantiate that indeed a sag or part of a sag is present." (April 30, 2007, Yarbrough Report at 2.) Based on this information, Dr. Yarbrough opined that "the subjacent mine void is still failing in places as it did 10 years ago when employees of the Island Creek Coal Co. visited the site and void closure with surface subsidence will continue in the future." (Id.)

In July of 2008, Dr. Yarbrough reviewed the report of Mr. Alexander Young who calculated the coal extraction rate of the property and mapped 25 acres of subsided land. Based upon the information contained in the report, Dr. Yarbrough opined that Island Creek took out more coal in portions of the mine than the pillars or floor could take without failure, void closures, and subsidence of the surface. (July 24, 2008, Yarbrough Letter at 1.) Dr. Yarbrough further opined that normal extraction rates for a room and pillar coal mine is fifty percent and indicated how subsidence occurs. Utilizing measurements of pillar size and room widths of undermined portions of the farm, Dr. Yarbrough found that the extraction rate of the coal varies considerably through parts of the mine and "much of the extraction rate is above 50%." (Id. at 2.) Based upon this information and his discussion with Mr. Shouse, Dr. Yarbrough opined that "the subjacent mine will continue to decay and in those areas of high coal extraction and adverse rock conditions void closure will continue in the mine and more subsidence of the surface and interruption of drainage in the agricultural fields will occur in the future." (Yarbrough July 24, 2008 Letter.)

Finally, in reviewing the motion in limine filed by Island Creek, Dr. Yarbrough stated that based upon Mr. Young's extraction rate information and Mr. Young's mapping of the

25 acres of land that have actually subsided, "[i]n the opinion of this geologist and subsidence expert, Ronald Yarbrough, this amount of extraction, considering the geology (based on drill logs over the coal seam) is excessive and results in a high expectation and reasonable probability for subsidence of the surface, past, present and future." (March 21, 2009 Yarbrough Rebuttal Statement at 2.)  Dr. Yarbrough further stated that there "is no speculation by the geologist that unusually high extraction rates in a coal mine . . . increases the possibility of future subsidence."  Id.  Additionally, Dr. Yarbrough stated that

> Mr. Young has mapped 171 acres of mining activity subjacent to the Hancock farm in which surface depression and ponding has or is occurring.  He found a mean extraction rate (maps supplied to the State by the coal company) of 74.6% of the coal had been removed.  It is my opinion, that the pillars that remain are simply too small to support the overburden over an extended period of time and will slab and finally the pillars will crush out, the void will close and finally a depression (sag) will occur on the surface as many have done over the years. . . . It is well known in the mine subsidence literature that once a mine void begins to fail and overburden pressures are applied to nearby pillars, floor and roof that other mine voids will fail.

(Id. at 3.)  Additionally, Dr. Yarbrough states that in the areas of land that have already subsided, "it is a known that considerable subsidence has occurred, overburden pressures have been shifted to other pillars as a result of the void failures and future failures are certain. Again, the writer, nor does anyone else, known when or where additional subsidence will occur."  (Id. at 4.)

After a review of the testimony cited by the parties, the Court finds that Hancock has submitted evidence supporting his position that future subsidence is reasonably certain to occur on the property in question and supporting his claim for diminution of the fair market

value of the property based upon both the actual subsidence and the risk of future subsidence. Based upon both the GIS calculations and Dr. Yarbrough's own calculations of the extraction rates for the farm, the mapping of the 25 subsided acres by Mr. Young, his site visit, discussions with Mr. Hancock and Mr. Shouse, and his experience, Dr. Yarbrough has opined that the amount of extraction under the property is excessive and "results in a high expectation and reasonable probability for subsidence of the surface, past, present, and future." (March 21, 2009, Yarbrough Rebuttal Statement.)  Similarly, evidence of future subsidence is a reason articulated by C.W. Wilson in support of the estimated diminution in fair market value of the property in question. Island Creek has not pointed to any Kentucky authority indicating that consideration of future subsidence is inappropriate. As a result, the Court denies Island Creek's motion to exclude such evidence.

### B.  Limitation of Dr. Yarbrough's Testimony

Island Creek argues that Hancock's subsidence expert, Dr. Ronald Yarbrough, testified that the proper method of determining whether subsidence is present is through the use of a level survey. (Yarbrough Deposition at 40-41, 83). Despite his stated adherence to the use of level surveys, Dr. Yarbrough used this methodology on only 2.66 acres of Hancock's property. As a result, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), Island Creeks seeks to preclude Dr. Yarbrough from testifying regarding subsidence in any area of Hancock's farm outside of the 2.66 acres that he tested according to his own accepted methodology.

Hancock objects arguing that Island Creek has misstated Dr. Yarbrough's testimony.

According to Hancock, the purpose of the level survey is not to determine whether something has subsided, but to determine whether an area is continuing to subside. (Yarbrough Deposition at 40 (the purpose is to measure "the amount and duration of ground and structural movements.").  According to Hancock, the level survey methodology was developed by Dr. Yarbrough and others who were working with the State of Illinois in developing a process by which the State mine subsidence fund could determine when subsidence had concluded and when to commence house repairs on houses damaged by subsidence. (Id. at 42; March 21, 2009, Yarbrough Rebuttal Statement.)  In fact, in his rebuttal statement, Dr. Yarbrough stated that "[i]t is not standard operation procedure to plane table a farm looking for subsidence of the surface in my opinion." (March 21, 2009, Yarbrough Rebuttal Statement at 5.)

After reviewing the submitted deposition excerpts, Dr. Yarbrough's expert reports, and Dr. Yarbrough's Rebuttal Statement, the Court declines to limit the testimony of Dr. Yarbrough.  The record reflects that in assessing the subsidence problems on the property in question, Dr. Yarbrough visited the farm, consulted with Mr. Hancock and Mr. David Shouse regarding ponding of water and reduction of crop yields on the property, toured the farm, and surveyed certain areas.  According to Dr. Yarbrough, he utilized level surveys on three areas of the property to substantiate the opinion of the Plaintiff and to calculate the amount of subsidence that can be expected.  Dr. Yarbrough states that he did not participate in mapping of the 25 acres of subsided land; instead Mr. Young calculated these areas utilizing a GPS instrument.

Dr. Yarbrough's opinions are set forth in his expert reports and rebuttal statement. It appears that Dr. Yarbrough will offer testimony regarding the extraction rate of the coal on the property, how subsidence occurs, indications of subsidence on the property, a discussion of Mr. Young's findings with respect to extraction rates and mapping of the subsided area, and his opinions regarding probability of future subsidence. Island Creek has presented no evidence that Dr. Yarbrough's opinions violate either Federal Rule of Evidence 702 or the principles set forth in <u>Daubert</u>. Any alleged failure by Dr. Yarbrough to conduct a level survey of the entire 25 acres goes to the weight of Dr. Yarbrough's testimony and not admissibility. For these reasons, the motion to limit Dr. Yarbrough's testimony is denied.

### C. C.W. Wilson's Methodology

#### 1. "Per Acre" Methodology

Island Creek seeks to exclude the testimony of C.W. Wilson, Hancock's real estate appraiser, arguing that Mr. Wilson utilized a per acre method of establishing the reduction in the fair market value of the property which is prohibited under Kentucky law. <u>See</u> <u>Texaco, Inc. v. Melton</u>, 463 S.W.2d 301 (Ky. 1970)(We reaffirm the ['before and after'] rule and reject the 'per acre' theory . . . ." <u>Id.</u> at 304.) Island Creek argues that Mr. Wilson testified that Hancock's property has decreased in value by $1,220 per acre due to the alleged subsidence. According to Island Creek, Mr. Wilson testified that 654 acres had decreased in value due to the risk of subsidence.[1] Island Creek argues that Mr. Wilson's method of

---

[1] Q.  -- you note in numerical paragraph 2 there that, "About 85 percent of the Hancock farm has been mined out and, thus, without specific attribution of acreage, 654 acres might

9

examining and valuing each acre of Hancock's property is prohibited by Melton.

The Court disagrees. In Texaco v. Melton, the Supreme Court of Kentucky indicated that in assessing permanent damage to land the proper measure of damages is the diminution in fair market value approach or a "before and after" approach. 463 S.W.2d at 304. In Melton, Texaco was operating an oil well on plaintiff's property. The evidence at trial indicated that "in exercising those rights [Texaco] permanently injured many scattered areas." Id. Texaco argued that damages for the permanent injury should be calculated based upon the actual damages to those particular areas of land actually occupied and utilized by Texaco. Texaco "term[ed] this the . . . per acre theory as opposed to the before and after rule." Id. The Kentucky Supreme Court rejected this approach finding that Texaco permanently injured many scattered areas "but to attempt to value each of them seems impracticable if not impossible." Id. The Kentucky Supreme Court found that

> [i]t appears to us that the proper and most just approach to this difficult problem is to require the appraisers to recognize and consider that Texaco

---

reasonably be expected to be subject to subsidence." Do you see that?
    A.    Yes
    Q.    So what you're saying there is that roughly 60 -- 654 acres have been undermined; true?
    A.    I did say that, yes, and that is based on Mr. Alexander's GPS identification of the number of acres that were subject to mining.
    Q.    Okay. And the 654 acres, that is what you base your diminution in value on; right?
    A.    Yes.
    Q.    So you have, for each of those 654 acres, decreased the value due to the risk of subsidence?
    A.    On a per-acre basis.

(Wilson Deposition at 41.)

> owned the mineral rights and had the privilege of using the surface subject to the obligation of paying for the damage inflicted on the surface owners in the exercise of that privilege. Cf. Davidson v. Grigsby, Ky., 451 S.W.2d 632 (1970). The 'before damage' valuation must be the worth of the real estate on the date of the first occurrence of actual damage after the date of deed to Meltons and Weis, but with Texaco's ownership and privilege being recognized. The 'after damage' value likewise must be fixed with full consideration of these same factors. When that is done and the figures stated, the difference will be the depreciation for permanent actual damages.

Id. at 304-305.

Contrary to Island Creek's assertion, Mr. Wilson calculated the reduction of the fair market value of the property based upon the "before and after" approach articulated in Melton, and not upon an examination or valuation of only those particular areas of land that have subsided. A review of Mr. Wilson's expert report indicates that Mr. Wilson calculated the before damage value based upon the worth of the real estate as if it had never been damaged. (C.W. Wilson Expert Report at 25.) Similarly, Mr. Wilson calculated the after damage value based on the value of the property with full consideration of several factors, including the actual damage, the decrease in land class and utility, the need to continuously maintain the grade and elevation of portions of the property, the right exercised by Island Creek to extract coal, and the exposure to continued, non-compensable subsidence. (Id. at 19, 28-31.)

Specifically, Mr. Wilson appraised the value of the property at $4,075,000 or $3,567 per acre without subsidence. He appraised the value of the property with subsidence at $2,950,000 or $2,374 per acre, for a diminution in value due to the subsidence effect in the

amount of $1,125,000.[2] Wilson based his conclusion upon the definition of market value set forth on page three of his report: "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." (Wilson Expert Report at 3.)  Clearly, Mr. Wilson's method of examining and valuing the property is not comprised of examining and valuing only those acres which have suffered actual subsidence as advocated by Texaco and rejected by the Supreme Court in Texaco v. Melton.  For this reason, the Court denies Island Creek's motion to exclude Mr. Wilson's testimony.

### 2. Market Reluctance

Additionally, Island Creek argues that Mr. Wilson's testimony regarding the remaining acreage's depreciation in value based on "market reluctance" to purchase the property is likewise contrary to Kentucky law.  According to Island Creek, a loss in value, with no physical harm is just a "stigma" claim and Kentucky law has rejected stigma claims where no physical injury to the property has occurred.  City of Louisville v. Munro, 475 S.W.2d 479, 489 (Ky. 1971); Smith v. Carbide, 226 S.W.3d 52, 55 (Ky. 2007).  Island Creek maintains that Mr. Wilson cannot speculate that the unaffected acreage is injured because of a stigma that the property might subside on some future, unknown date.   Island Creek

---

[2]Hancock submits a statement by Mr. Wilson indicating that his use of the term "per acre" is used as a unit of comparison which is typically used in agricultural appraisals. Hancock submits that the "per acre basis" referred to by Mr. Wilson in his deposition and report is not the same "per acre" theory rejected in Texaco v. Melton.  The Court agrees.

contends Hancock is not entitled to recover damages for diminution in property value due to reputation or stigma claims.

Hancock has alleged a physical harm to the property in question and therefore, recovery of stigma damages would be appropriate.  See Mercer v. Rockwell Int'l Corp., 24 F. Supp. 2d 735, 744 (W.D. Ky. 1998).  Further, Hancock correctly points out that Mr. Wilson's appraisal of the diminution of fair market value of the property in question addresses the market reaction to a property with a documented history of subsidence, not a true "stigma" claim.  Any sale of the property would require full disclosure of history of subsidence and known condition of the property.

For these reasons, the Court denies Island Creek's motion to exclude the testimony of C.W. Wilson.

### D.  Remediation Damages

Island Creek argues that Hancock should be precluded from offering evidence of remediation or property restoration costs because such cost exceed the alleged diminution in fair market value of the affected acreage of this property.  Island Creek argues that Hancock's expert on remediation has opined that it would cost approximately $387,000 to remediate the 25 allegedly impacted acres, while Hancock's appraiser has stated that the diminution in the property value for the same acreage is $1,220 per acre, or $30,500.  Based upon the Kentucky Supreme Court's holding in Ellison v. R&B Contracting, Inc., 32 S.W.3d 66, 70 (Ky. 2000), Island Creek argues that Hancock cannot recover restoration costs because diminution of property value is the upper limit of damage recovery.

The Supreme Court of Kentucky in Ellison v. R&B Contracting, Inc., 32 S.W.3d 66 (Ky. 2000), reaffirmed the measure of damages for injury to real estate: "(1) if the injury to the property is permanent, the amount by which the fair market value of the property decreased immediately prior to and after the [injury]" is the measure of damages; "but (2) if the injury to the property is temporary, the cost to return it to its original state" is the measure of damages. Id. at 69. Explaining the distinction between "permanent" and "temporary" injuries, the Supreme Court observed that "injuries to real estate are 'permanent' where the cost to restore the property to substantially its original state exceeds the amount by which the injury decreased the property's value." Id. at 70. The Supreme Court held that "the amount by which the injury to the property diminishes its total value operates as an upper limit on any damage recovery." Id. Property damage claimants "may receive restoration cost damages in injury-to-property cases only when compensation in the form of restoration costs is the least expensive way to make those claimants whole." Id.

While Hancock does not dispute the law in Kentucky regarding the measure of damage to real estate, Hancock argues that both statutory law and case law permit him to recover both diminution in the fair market value of the property, see Island Creek Coal Company v. Rodgers, 644 S.W.2d 339 (Ky. App. 1982), and the restoration costs as well, see 30 U.S.C. § 1253, et seq. and 405 KAR 18.210. Hancock maintains that the requirement to compensate a landowner for the diminution in fair market value as stated in Rodgers, 644 S.W.2d 339, was supplemented by the Federal government and Kentucky legislature in the enactment of the Surface Mining and Control Reclamation Act of 1977 (SMCRA) which

14

according to Hancock requires the repair and restoration of land damaged by subsidence. SMCRA requires operators of mines to adopt measures to prevent subsidence to the extent technologically and economically feasible. 30 U.S.C. § 1266(b)(1); 405 KAR 18:210. Hancock argues that the Federal and State laws show a strong preference toward repair of damaged property. According to Hancock, under the SMCRA when there is damage to surface lands, the "permittee must correct any material damage resulting from subsidence caused to surface lands, to the extent technologically and economically feasible, by restoring the land to a condition capable of maintaining the value and reasonably foreseeable uses that it was capable of supporting before subsidence damage." 30 C.F.R. § 817.121(c)(1). See also 405 KAR 18:210, Section 3(1).[3]

Hancock argues that the Kentucky Court of Appeals in Murray v. McCoy, 949 S.W.2d 613 (Ky. App. 1996), recognized that there are some cases where an award of either cost of repairs or diminution in value does not put the injured party in the position he would have been in had the party with whom he dealt not failed to meet the duties imposed upon him.[4] In the present case, Hancock argues that he can repair those twenty-five acres that are

---

[3] Kentucky requires as follows: "(1) Repair of damage to surface lands. The permittee shall correct any material damage resulting from subsidence caused to surface lands, to the extent technologically and economically feasible, by restoring the land to a condition capable of maintaining the value and reasonably foreseeable uses that it was capable of supporting before subsidence damage." 405 KAR 18:210, section 3(1).

[4] Murray v. McCoy is not factually similar to this case. The Kentucky Court of Appeals in Murray addressed "the measure of damages in cases where there is faulty construction not in accordance with a building contract." 949 S.W.2d at 614. Murray addresses the measure of damages in a breach of a building contract case, not an injury-to-property case which is controlled by the Supreme Court's decision in Ellison.

15

damaged by subsidence, but it does not make him whole. Hancock contends that a large part of his farm has been undermined and, thus, has been damaged. According to Hancock, the prudent purchaser, knowing he can never recover for subsidence that occurs and knowing that the property has subsided, will not pay the same as he would for property that has never subsided or for property on which he can recover his damages when the subsidence damage does manifest itself. (Plaintiff's Response at 24.)

In this case, Hancock is primarily seeking to recover for permanent damage allegedly done to the property as a whole. As demonstrated by his proposed expert testimony and his response to the motion in limine, Hancock seeks damages for the diminution in the fair market value of the entire 1100 acres of the property, not simply remediation of the 25 acres. Counsel for Plaintiff concedes that he has always practiced this case "based upon the surface owner having one opportunity to recover damage to the farmland." (Response at 9.) If Hancock is successful in convincing a jury that the farm has been damaged as a whole, and the jury awards damages based on the diminution in value before and after, then he will have been made whole. Neither the Kentucky regulations nor the case law cited by Hancock permit recovery of the repair or restoration costs of the property in addition to the diminution in the fair market value of the property. For these reasons, if the jury finds that the entire farm has been permanently damaged by Island Creek's mining activities, the Court will not permit Hancock to recover both measures of damages.

However, the jury might reject Plaintiff's theory that the entire property is permanently damaged but nevertheless conclude that the Plaintiff has proven damage to the

16

25 acres which has allegedly subsided due to Island Creek's mining activity. In that case, Hancock should not be precluded from recovering for that damage. Ordinarily, the proper measure of damage in such a case would be the cost of repair unless the diminution in value for that portion of the property was less than the cost of repair. Ellison, 32 S.W.3d at 70. However, contrary to Island Creek's argument, the Kentucky Subsidence Control regulations and the Kentucky Surface Mining Act cited by Hancock permit recovery for the cost to restore the property to the extent those repairs are technologically and economically feasible.

KRS 350.250(3) provides a private right of action for violations of the Kentucky Surface Mining Act and its regulations. Specifically, KRS 350.250(3) provides:

> Any person who is or may be adversely affected by the violation by any person of any rule, regulation, order or permit issued pursuant to this chapter may bring a civil action for injunctive relief or for damages or both (including reasonable attorney and expert witness fees) in the Circuit Court of the county in which the surface coal mining operation complained of is located.

KRS 350.250(3). See White v. Shepard, 940 S.W.2d 909, 910 (Ky. App. 1997). Hancock claims that subsidence has occurred on 25 acres of his property and seeks restoration of the land pursuant to 405 KAR 18:210, Section 3(1) which provides that a "permittee shall correct any material damage resulting from subsidence caused to surface lands, to the extent technologically and economically feasible, by restoring the land to a condition capable of maintaining the value and reasonably foreseeable uses that it was capable of supporting before subsidence damage." 405 KAR 18:210, Section 3(1). If subsidence has in fact occurred on the 25 acres, this regulation requires Island Creek to restore the land to the extent technologically and economically feasible. Island Creek's failure to do so constitutes a

violation of the regulations. Thus, Hancock may properly seek damages in the amount of the restoration costs to the 25 acres which has suffered the incidents of subsidence, along with attorney and expert witness fees, pursuant to KRS 350.250.

For these reasons, the Court concludes that Hancock, in his claim that the entire property has been permanently damaged, is not entitled to recover for both the diminution in the fair market value of the property and restoration costs. Inasmuch as the evidence relates to an alternative jury finding on subsidence damage to the 25 acres, Island Creek's motion to exclude any evidence of restoration costs of the property is denied.

## CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion in limine by Island Creek [DN 38] is **denied**.

cc: counsel of record